# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0469-20

S.R.L., SR.,

      Plaintiff-Respondent/
Cross-Appellant,

v.

B.A.S.,

      Defendant-Appellant/
Cross-Respondent.

_____

Submitted November 15, 2021 – Decided February 2, 2022

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket Nos. FV-01-0103-21 and FV-01-0042-21.

B.A.S., appellant/cross-respondent pro se.

Melissa Rosenblum, attorney for respondent/cross-appellant.

PER CURIAM

The parties to these consolidated actions filed under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, appeal from final restraining orders (FROs) entered against them after the two matters were tried on August 5, 2020.  In FV-01-0042-21, defendant B.A.S. (Bella)[1] appeals from the FRO entered against her in favor of her ex-boyfriend, plaintiff S.R.L., Sr. (Shawn), which the trial court entered after finding Bella committed the predicate act of harassment, N.J.S.A. 2C:33-4(b), by shoving Shawn, causing him to fall backward.  In FV-01-0103-21, Shawn cross-appeals from the FRO entered against him after the trial court concluded Shawn committed the predicate act of assault, N.J.S.A. 2C:12-1, by recklessly causing injuries to Bella's neck, chest, and breast.

On appeal, Bella argues the court erred in granting the FRO against her because it improperly found her testimony to lack credibility based on the court's attributing to Bella a statement that Shawn's counsel made.  She also argues that the court improperly concluded she harassed Shawn by erroneously finding she meant to injure Shawn, and, for the first time on appeal, that the court ignored she was acting in self-defense.  Additionally, Bella contends she received the

---

[1]  This court uses fictitious first names to protect the identity of victims of domestic violence and to preserve the confidentiality of these proceedings.  R. 1:38-3(d)(9)-(10).

ineffective assistance of counsel, who failed to subpoena the police report and to offer into evidence various documents, including medical records.

In his cross-appeal, Shawn contends the court erred in granting the FRO against him because the evidence did not support a finding that he assaulted Bella, and the court failed to make sufficient findings about the alleged assault and about an immediate need to protect Bella from further abuse.

We have considered the parties' contentions in light of the record and applicable principles of law. Although we affirm the trial court's determination that Bella committed the predicate act of harassment, we vacate the FROs against both parties and remand the matter for the trial court to provide a more comprehensive statement of its findings of fact and conclusions of law as to whether Shawn committed the predicate act of assault and whether both parties needed an FRO for their protection.[2]

I.

We summarize the facts found by the trial court at the trial of the consolidated matters. At the time of alleged domestic violence, Bella and Shawn had been in a dating relationship for fourteen years. In 2006, they decided to

---

[2] While the matter is pending, the temporary restraining orders (TRO) previously entered against the parties shall remain in force pending completion of the remand.

A-0469-20

live together as a couple in a home owned by Shawn. Jack, Bella's then nineteen-year-old son, lived with them at the time the alleged domestic violence occurred.

On July 10, 2020, a dispute arose between Shawn and Jack about Jack receiving packages on his friend's behalf that were delivered to Shawn's home. The next evening, Shawn text messaged Bella from his office on the ground floor of the house to make her aware of the packages and to express his disapproval. Bella, who was on the second floor, went downstairs to the kitchen on the first floor.

According to Shawn, before Bella went to the kitchen, she first went to his office and started a verbal altercation. She yelled, cursed, and punched him on the chest. When she left, he followed her into the kitchen, where she continued punching him on the chest and yelling. After Bella left the office and went to the kitchen, Shawn followed. While Shawn stood in the doorway to the kitchen, Bella raised her arms and pushed him causing Shawn to trip and fall backwards. After he fell, Bella and Jack were on top of him, hitting and threatening him. Shawn flailed his arms to try to get them off him, which they eventually did.

According to Bella, after Shawn fell, she went into the kitchen and shut the door. He then stood up and entered the kitchen after her. She pushed him

4

out the kitchen into the living room, where Shawn hit her on the side of her head. She fell to the ground, and he began to strangle her. She was able to say "you're killing me" before losing consciousness.

According to Jack, he heard the argument and the fall from his room in the basement. When he heard Bella say "you're killing me" from the basement, he ran upstairs and "flung" Shawn off her to the piano. Shawn then grabbed Jack's chain and held onto him. When Bella regained consciousness, according to her and Jack, she saw Shawn holding onto Jack. Jack eventually punched Shawn, and he let go.

Soon after the parties physically separated, Bella and Jack called the police and Egg Harbor Township Police Officer Elio Ramirez and another officer responded to the scene. When Ramirez spoke to Bella and Jack, they described the events of the evening, but Bella did not mention she lost consciousness. Based on Ramirez's observations of redness on Bella's neck, he arrested Shawn. Shawn was released that night and was advised to stay somewhere else for the night, which he did. The following morning, he went back home to pick up a few belongings and left.

After Shawn left, Bella filed a domestic violence complaint and a request for a TRO against Shawn, which was granted. In her complaint, she alleged

5

Shawn "attempted to strangle her" and a "slight injury was noticed by patrol on scene." She also alleged the predicate acts of assault and "any other crime involving risk of death or serious bodily injury." As to any prior history of domestic violence, her complaint stated: "Unreported recent incidents. However, a TRO was granted 10+ years ago but dismissed."

On July 29, 2020, Shawn filed a domestic violence complaint and a request for a TRO against Bella. In his complaint, he alleged the facts according to him as already discussed above. He also alleged that Bella called his relatives, including his children, and that she had access to her relatives' weapons. He alleged the predicate acts of assault and harassment.

As to a prior history of domestic violence, Shawn's complaint stated the following:

> [Bella] made a false accusation against him about 10 or 11 years ago but she then dismissed the case.
>
> [She] has told him a thousand times in the past that she is going to bury him in the back yard.
>
> [He] has asked [her] to leave many times in the past b[u]t she has refused to go. [She] has told plaintiff that she would get the house no matter what.
>
> [And, she] has been under psychiatric care and has made threats against her life before. [She] is on heavy medications for pain management.

A-0469-20

The matters were consolidated and came before the court for a trial on the FROs on August 5, 2020. At trial, each party testified to the events of July 11. Also, Jack testified on behalf of his mother, and Shawn called Ramirez as a witness.

In its oral decision placed on the record at the trial's conclusion, the court relied upon Bella's admission and found that Bella "put both arms up" and "shoved [Shawn] out of the kitchen," and that "[Shawn] tripped backwards onto the floor." The court held that evidence supported "a conclusion that [Bella's] purpose, the conscious object was to offensively shove him." The court concluded Shawn "established the predicate offense of harassment,"[3] relying on Bella's admission.

The court also found there was bodily injury to Bella evidenced by injuries on her chest, around her neck, and the left side of her chest. However, it rejected Bella's and Jack's description of how she sustained those injuries. The court found their testimony to be incredible. Specifically the court did not believe that Shawn, who weighed over 400 pounds, straddled Bella and strangled her,

---

[3] The comments in the FRO against Bella stated the court made a "finding of assault as alleged," which is inconsistent with the court's oral decision that discusses Bella's acts as only harassment and omits any conclusion that they amounted to an assault.

A-0469-20

rendering her unconscious; or that Jack threw Shawn across the room. However, the court concluded Shawn committed the predicate act of assault because Bella was injured, and Shawn recklessly caused her injuries.

Last, the court found as to both parties, "there [was] a need for a domestic violence restraining order to protect [Bella and Shawn] from further acts of domestic violence." The court stated its conclusion was "based upon [its] ability to observe the demeanor and the -- and hear the testimony of both [Shawn] and [Bella]," and its "belie[f] that there would be an argument again." Also, the court "suspected that a large part of the reason [it] [was] hearing all this testimony [was] to settle the issue with respect to the ownership and right of possession of the home on a permanent basis."[4] Based upon these comments, the court issued two FROs, one against each party. These appeals followed.

II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part's findings of fact because of its special expertise in family matters. Id. at 413.

---

[4] During the trial, the parties testified to issues about Bella's interest in the home owned by Shawn. Approximately three to four years earlier, as part of a refinance, Bella was placed on the mortgage but not on the deed. According to Shawn, a dispute arose as to whether he was going to deed an interest in the home to Bella a few weeks before the alleged domestic violence.

A-0469-20

Deference is especially appropriate in bench trials when the evidence is "largely testimonial and involves questions of credibility." Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). A trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (alteration in original) (quoting State v. Hoffman, 149 N.J. 564,

584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes." Cesare, 154 N.J. at 400.

To determine whether the entry of an FRO is appropriate, the trial court must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). If the court finds a defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126.

While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -(6),[5] to protect the

---

5 The six non-exclusive factors include:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
> (2) The existence of immediate danger to person or property;
> (3) The financial circumstances of the plaintiff and defendant;
> (4) The best interests of the victim and any child;
> (5) In determining custody and parenting time the protection of the victim's safety; and

victim from an immediate danger or to prevent further abuse." <u>Id.</u> at 127; <u>see also</u> <u>J.D.</u>, 207 N.J. at 475-76. The second <u>Silver</u> prong "ensure[s] that the protective purposes of the Act are served, while limiting the possibility that the Act, or the courts, will become inappropriate weapons in domestic warfare," <u>J.D.</u>, 207 N.J. at 488, "trivializ[ing] the plight of true victims." <u>Corrente v. Corrente</u>, 281 N.J. Super. 243, 250 (App. Div. 1995).

## A.

With these guiding principles in mind, we turn to the parties' contentions before us. Bella argues the court improperly found her testimony lacked credibility because it attributed to Bella Shawn's counsel's statement that Shawn "jumped up." Additionally, Bella contends the court improperly concluded she harassed Shawn by erroneously holding she meant to injure Shawn.[6] Notably,

(6) The existence of a verifiable order of protection
from another jurisdiction.

[N.J.S.A. 2C:25-29(a)(1) to (6).]

[6] Bella's brief also includes a point heading arguing that her actions were in self-defense. This issue was not raised before trial court and is unsupported as her brief does not include any discussion of this issue. Under these circumstances, we do not consider this contention because it was not raised before the trial court, <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973); <u>Correa v. Grossi</u>, 458 N.J. Super. 571, 576 n.2 (App. Div. 2019), and, even if it was, we would deem the argument abandoned. <u>See</u> <u>N.J. Dep't of Env't Prot. v.</u>

Bella does not challenge the court's holding that a final restraining order was necessary to protect Shawn.

As noted, the trial court found Bella committed harassment, N.J.S.2C:33-4, which is a predicate act under the PDVA.[7] See N.J.S.A. 2C:25-19(a)(13). A person commits the offense of harassment if, among other acts, the person acts "with the purpose to harass another, . . . [and s]ubjects another to . . . shoving or other offensive touching." N.J.S.A. 2C:33-4. To conclude a defendant has criminally harassed a plaintiff, the court must first find defendant subjected plaintiff to a statutorily enumerated contact, including shoving or other offensive touching. See Hoffman, 149 N.J. at 576. Second, the court must find the defendant acted with the purpose to harass. See ibid. "The New Jersey Code of Criminal Justice [(Code)] defines 'purposely' as follows: 'A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result.' N.J.S.A. 2C:2-2(b)(1)." Id. at 577. "A finding of a purpose to harass may be

_____

Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

[7] The parties do not dispute they were in a dating relationship and members of a shared household, which are classes of individuals that are protected under the PDVA. See N.J.S.A. 2C:25-19.

inferred from the evidence presented," and "[c]ommon sense and experience may inform that determination." Ibid.

Here, the trial court correctly found Shawn established Bella committed the predicate offense of harassment. First, it was undisputed that Bella shoved Shawn, which is explicitly the type of contact that can constitute harassment. Second, the trial court correctly inferred the conscious object of Bella's conduct was to harass Shawn. Common sense indicates when two people are involved in a verbal altercation and one escalates the matter by using physical force, as Bella did here, that person does so with the intent to at least harass and offend the other, if not to also cause bodily harm. Here, there was substantial evidence in the form of both parties' testimony to support the trial court's conclusion that Bella harassed Shawn.

We conclude Bella's remaining arguments about the trial court confusing a statement made by Shawn's attorney for her statement and about ineffective assistance of counsel, which is not cognizable in a domestic violence action, are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-0469-20

B.

Having concluded the evidence supported the trial court's finding that Bella committed the predicate act of harassment, we turn to Shawn's contentions. In Shawn's cross-appeal, he argues the court erroneously held he assaulted Bella because that holding was not supported by the evidence, other than that she was injured. He concedes he flailed his arms to get her and her son off of him while on his back, but claims his conduct was not reckless. Rather, he claims his actions were purposeful "to get her and her son off of him," not to cause injury to Bella.

An assault, N.J.S.2C:12-1, is also a predicate act under the PDVA. See N.J.S.A. 2C:25-19(a)(2). A person commits simple assault if he "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1(a)(1). "Bodily injury" is "physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). "Not much is required to show bodily injury. For example, the stinging sensation caused by a slap is adequate to support an assault." N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997).

The Code defines "recklessly" as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards

14

a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

[N.J.S.A. 2C:2-2.]

The trial court held Shawn assaulted Bella based on only one finding. The court found that there was bodily injury to Bella demonstrated by her injuries. It also made a credibility determination, finding that portions of Bella's and Jack's testimonies were not believable, rejecting their assertions that Shawn straddled Bella and strangled her, Bella was rendered unconscious, and Shawn threw Jack across the room. Without further findings, the court was convinced Shawn assaulted Bella.

However, to hold Shawn assaulted Bella, the court was required to identify what Shawn did to cause the injury, and why it concluded the evidence supported a finding that Shawn acted recklessly. Although the court rejected Bella's version of how and why she was injured, it did not find any facts as to what he did do to injure Bella and what evidence supported a finding that he acted recklessly. Without the required findings, we are constrained to remand

for the trial court to elaborate on its reasons for finding Shawn committed the predicate act of assault.

C.

We also conclude that on remand the trial court must, as Shawn argued before us,[8] make more detailed findings as to why an FRO was necessary to protect Bella, Shawn or both. With any bench trial, the trial court has a critically important obligation to "find the facts and state its conclusions of law thereon." R. 1:7-4(a). When a court falls short of meeting this obligation, appellate review is compromised. Kamen v. Egan, 322 N.J. Super. 222, 226 (App. Div. 1999) (citing Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).

When concluding under Silver, that an FRO is necessary to ensure protection in the future, in some cases, "the risk of harm is so great" that the determination of whether a restraining order should be issued is "perfunctory and self-evident." J.D., 207 N.J. at 475-76, 488. Other cases, however, require an in-depth analysis to determine whether "relief is necessary to prevent further abuse." Id. at 476; R.G. v. R.G., 449 N.J. Super. 208, 228 (App. Div. 2017)

---

[8] As noted earlier, Bella did not raise this issue, but we conclude that without a more detailed statement of reasons as to why FROs were required for the protection of both parties, the FRO filed against her cannot be sustained for the same reason it cannot be sustained against Shawn.

16

("Commission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]."). In all cases, the critical inquiry under the second prong is, after considering the statutory factors, N.J.S.A. 2C:25-29(a)(1) to (6), determining "whether a domestic violence restraining order is necessary to protect the plaintiff from immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 128.

In reaching the determination that a restraining order is necessary, a trial court must also "exercise care to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G., 449 N.J. Super. at 225, 230 (citing J.D., 207 N.J. at 475-76) (reversing order granting FRO despite finding defendant's acts of vulgar name-calling and assault by repeatedly shoving plaintiff to the ground were "unacceptable and repugnant" because that did not support a finding that a final restraining order was necessary for plaintiff's immediate protection or to prevent further abuse).

Also, although the court may look to other relevant factors not included in the statute, N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015), a court must consider the parties previous history of abuse in its analysis before determining an act of domestic violence had been committed. Cesare, 154 N.J.

at 401-02. This "second prong set forth in Silver requires [that] the conduct [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27); see also Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995) (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims"). However, a prior history of domestic violence is not always required to support a court's determination because "the need for an order of protection upon the commission of a predicate act of 'domestic violence' . . . may arise even in the absence of such [a history] where there is 'one sufficiently egregious action.'" Silver, 387 N.J. Super. at 128 (quoting Cesare, 154 N.J. at 402).

Here, in deciding the matter and addressing the need for a restraining order to protect the parties, the trial court did not include any specific evidence of its consideration of the statutory factors under Silver before reaching its conclusion. Rather, it expressed concern about police being called in response to future arguments, which was insufficient to satisfy its obligation to make the required findings. Significantly, the court made no mention of either party's testimony about why they needed an FRO for their protection, including testimony about alleged prior acts of domestic violence and fear of what might happen in the future if an order was not entered. For example, they both testified

about their fear that the other would kill them. Bella also testified about actions she took because of her fear and the effect it had on her. Shawn testified about Bella's access to weapons and to her threats to "chop [him] up and bury [him] in the backyard." Whether these statements or any other evidence established the second prong under <u>Silver</u> must be determined in the first instance by the trial court, which had the benefit of observing and listening to the parties and considering all of their evidence.

Under these circumstances, we again are constrained to remand the matter for reconsideration and for a more robust statement of reasons. However, by our remand, we do not imply any particular result to the trial court's reconsideration of this matter.

Affirmed in part, vacated and remanded in part for further proceedings consistent with our opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION